308 S.E.2d 131

**STATE of West Virginia**

v.

**Rudy ZACCAGNINI, Jr.**

No. 15726.

Supreme Court of Appeals of
West Virginia.

Sept. 29, 1983.

Franklin D. Cleckley, Morgantown, Frank C. Mascara, Fairmont, for appellant.

Charles E. Anderson, Pros. Atty., and Jay Montgomery Brown, Asst. Pros. Atty., Fairmont, for appellee.

MILLER, Justice:

This is an appeal by Rudy Zaccagnini, Jr., from an order of the Circuit Court of Marion County sentencing him to three consecutive terms in the state penitentiary for delivery of LSD, possession of LSD with intent to deliver, and possession of cocaine with intent to deliver. The defendant claims that the trial court committed reversible error in denying his motion for change of venue, and in refusing to grant a continuance when it became apparent that the prosecution intended to call a previously unidentified informant as a witness. The defendant also contends that the court erred in making certain evidentiary rulings and in sentencing him to multiple terms for crimes growing out of the same transaction. After a careful examination of the record and the law, we find that no reversible error was committed.

On September 9, 1981, Ronald "Frog" Burroughs, who was acquainted with the defendant, entered the People's General Store in Fairmont which was operated by the defendant and purchased three sheets of LSD stamps from the defendant. Burroughs, at the time, was working in concert

with police officers as an undercover agent. The police who were standing outside the store were able to observe much of the transaction. After Burroughs emerged from the store, the officers obtained a warrant to search the premises. They also obtained warrants for the arrest of the defendant and two other people who, they believed, aided and abetted him. When they arrested the defendant they found a small amount of cocaine on his person. They also found marked money which they had previously provided Burroughs for the purchase of the drugs. Additionally, inside the People's General Store, they seized a case containing 2100 LSD stamps and a quantity of cocaine.

Subsequently, at the November Term of the Circuit Court of Marion County, the defendant was indicted for: (1) delivery of LSD; (2) possession of LSD with intent to deliver; and, (3) possession of cocaine with intent to deliver.

## I.

The defendant's first assertion is that the trial court erred in denying the motion for a change of venue. In *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978), we discussed the circumstances under which a change of venue should be granted and stated in Syllabus Points 1 and 2:

"1. 'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the

sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Point 2, syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

"2. 'A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* point 1, syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)."

*See State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982); *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981).

Additionally, we have rather consistently recognized that widespread publicity alone does not require a change of venue, nor does proof that prejudice exists against the accused. The critical question is whether the prejudice against the accused is so great that he cannot get a fair trial. *State v. Gangwer, supra; State v. Boyd*, 167 W.Va. 385, 280 S.E.2d 669 (1981); *State v. Peacher, supra; State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978).

The defense counsel attempted to demonstrate that the defendant could not receive a fair trial by introducing affidavits and newspaper articles and by *voir dire* examination of the veniremen. The bulk of the affidavits were forms containing the same general language which was conclusionary in nature. The substance of the affidavits was that because of the publicity about the defendant, in the affiant's view, the defendant could not obtain a fair trial.[1] Such affidavits and copies of published arti-

---

1. The typical affidavit stated:
   "(1) I am a resident of Marion County, West Virginia; my address is ─────────────.

   "(2) I have read newspaper articles and/or heard radio and television broadcasts relating to the arrest of the defendant, Rudy Zaccagnini, Jr., on certain drug violations in Marion County.
   "(3) Due to newspaper articles and/or radio and television broadcasts and due to widespread rumors circulated in Marion County, West Vir-

ginia, associating Rudy Zaccagnini, Jr., with drugs, the residents of Marion County, West Virginia, are biased and prejudiced against him.
   "(4) By reason of the foregoing and because of the public passion, prejudice and inflamed condition of the minds of the people of this community, the defendant, Rudy Zaccagnini, Jr., cannot in my opinion, obtain a fair and impartial trial or jury in Marion County.
   "(5) I am employed at ─────────────."

cles often are relevant evidence on a change of venue issue. However, we have generally held that affidavits which only state the opinion of the affiant that local prejudice exists will not alone support the granting of a change of venue. *State v. Riley,* 151 W.Va. 364, 151 S.E.2d 308 (1966); *State v. Douglass,* 41 W.Va. 537, 23 S.E. 724 (1895).

Most of the newspaper articles gave factual accounts of the events surrounding the defendant's arrest.[2] One indicated that officers had obtained warrants to examine the defendant's business records and income tax returns. Others reported that chemical analysis indicated that items seized at the People's General Store contained LSD, that the defendant was indicted, and that his motion for a continuance was denied. Photographs were printed showing the People's General Store after the police search and also showing items confiscated.

The principal statement of opinion was contained on the editorial page of the September 13, 1981, issue of the The Fairmont Times-West Virginian. That article referred to a drug arrest but made no mention of the defendant by name and concluded: "We are also encouraged that the public will view the arrests as an indication that the drug problem is solvable. That in itself would be a giant step forward."

Significantly, the majority of the articles appeared within a month of the defendant's arrest. Less than one column inch of newspaper coverage was given to him after the month of his arrest. It does not appear from the exhibits filed that his name was mentioned by the newspaper in the month before his trial.

██ At the commencement of the trial on February 9, 1982, some five months after his arrest, the court permitted de-

fense counsel to question the panel. In response to the *voir dire,* ten jurors of twenty-three who were initially called were excused for cause. Those jurors either expressed some knowledge of the case or were otherwise equivocal about their ability to render an impartial verdict based on the evidence.[3] We do not believe from the entire record surrounding the motion for a change of venue that the court abused its discretion in refusing the defendant's motion for a change of venue.

## II.

██ The defendant's second claim is that the trial court erred in refusing to grant a continuance, on the afternoon before the trial, when the prosecution first disclosed the name and its intention to use informant Burroughs as a witness for the State. We have dealt with the State's obligation to disclose the name of an undercover informant in *State v. Haverty,* 165 W.Va. 164, 267 S.E.2d 727 (1980), where we stated in Syllabus Point 1:

> "A common law privilege is accorded the government against the disclosure of the identity of an informant who has furnished information concerning violations of law to officers charged with the enforcement of the law. However, disclosure may be required where the defendant's case could be jeopardized by nondisclosure."

In *State v. Walls,* 170 W.Va. 419, 294 S.E.2d 272, 278 (1982), we made this further elaboration:

> "The general rule is that where the informant has only peripheral knowledge of the crime, his identity need not be disclosed. *E.g., United States v. Halbert,* 668 F.2d 489 (10th Cir.1982); *State v. Conger,* [183 Conn. 386] 439 A.2d 381 (1981); *Dorton v. State,* 419 N.E.2d 1289

---

**2.** For instance, one account said:

"Rudy Zaccagnini, Jr. of 1639 Otlahurst Drive was charged with delivery of LSD, possession of LSD with intent to deliver, and possession of cocaine with intent to deliver.

\* \* \* \* \* \*

"The 32-year-old Zaccagnini posted $75,000 bond for the three felony charges Thursday

afternoon and was released from the Marion County Jail at 1 p.m. by Magistrate James Feltz." The Fairmont Times-West Virginian, Sept. 11, 1981.

**3.** In *State v. Sette, supra,* we noted that almost fifty percent of the jurors summoned for jury duty were disqualified apparently because of a belief in the defendant's guilt.

(Ind.1981). Where the informant directly participates in the crime, or is a material witness to it, disclosure may be required, particularly where, in a drug related crime, he is the only witness to the transaction other than the defendant and the buyer. *Coby v. State*, 397 So.2d 974 (Fla.App.1981); *State v. Diliberto*, 362 So.2d 566 (La.1978); *Commonwealth v. Taliceo*, 13 Mass.App. 925, 430 N.E.2d 1220 (1982)."

After citing a number of cases, we also said in Syllabus Point 2 of *State v. Haverty, supra:*

"Where the government has an obligation to identify its undercover informant or agent, its failure to do so will not ordinarily be error if the defense was already aware of the informant's identity."

■ Several facts are apparent from the record. First, the defendant admitted on cross-examination that he had known Burroughs for a period of approximately two years prior to the date of his arrest on September 9, 1981. He did not deny that Burroughs had been in the store on the day of his arrest. Second, the actual transaction which Burroughs participated in was witnessed by the police who were outside the store watching Burroughs make the drug buy from the defendant. Consequently, Burroughs' testimony was not absolutely critical to the State's case. For these reasons, we find no error in the trial court's refusal to grant a continuance when the State disclosed the name of the undercover informant the day before the trial.

### III.

The defendant makes four assignments of error which relate to the trial court's rulings on evidentiary matters. Two of them involve the court's exclusion of evidence on the point that two other persons had been arrested for the same crime for which the defendant was being tried. We discussed the admissibility of evidence regarding the possibility that a person other than the accused committed the crime charged in *State v. Harman*, 165 W.Va.

494, 270 S.E.2d 146 (1980), and concluded in Syllabus Point 1:

"In a criminal case, the admissibility of testimony implicating another person as having committed the crime hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative. Consequently, where the testimony is merely that another person had a motive or opportunity or prior record of criminal behavior, the inference is too slight to be probative, and the evidence is therefore inadmissible. Where, on the other hand, the testimony provides a direct link to someone other than the defendant, its exclusion constitutes reversible error."

■ In our earlier case of *State v. Frasher*, 164 W.Va. 572, 265 S.E.2d 43 (1980), we stated in Syllabus Point 5:

"For evidence of the guilt of someone other than the accused to be admissible, it must tend to demonstrate that the guilt of the other party is inconsistent with that of the defendant."

In the course of the case before us the defense counsel called, as a witness, Muriel Twyman, a magistrate. He questioned her about warrants issued for Pamela Burner and Michelle Greaser. The prosecutor objected to this line of questioning. At the bench, the defense counsel indicated that arrest warrants had been issued for these two individuals for delivery of LSD on September 9, 1981. Out of the presence of the jury, the defense counsel explained:

"[W]e're saying that on that date that the defendant in this case, Rudy Zaccagnini, was also charged with delivery of LSD; and I say that this would tend to show and put some doubt with this jury as to whether or not the defendant in this case or Pam Burner or Michele Greaser are the ones who delivered LSD at this time, on that date."

The State responded to the effect that the two individuals who were present in the store at the time that the undercover agent made the purchase from the defendant

were separately charged not with the sale but with aiding and abetting.[4]

■ We believe that the trial court was correct in refusing to allow the defense to adduce evidence regarding the warrants since it is clear that the charges for aiding and abetting were not inconsistent with the defendant's charge for delivery of the controlled substance.

■ The defendant makes a further claim that his attorney was precluded from introducing evidence that another individual, Vincent Jones, who was present in the store, had in the past dealt in drugs. We find this assignment to be without merit as the defendant did testify to this fact on direct examination.

The defendant also asserts that the court committed error when it refused to permit him to put on several witnesses who would testify as to his reputation for truth and veracity. During the trial, the defendant denied that he delivered LSD to the undercover agent. It is the defendant's position that the State's evidence contradicted this testimony. The contradiction, in effect, impeached his reputation for truth and veracity.

■ It is generally held that although a witness' testimony has been contradicted by testimony from another witness, this does not mean that his reputation for truth and veracity has been impeached, such that there is an automatic right to put on character witnesses to testify on the issue of truth and veracity. *United States v. Medical Therapy Sciences, Inc.*, 583 F.2d 36, 52 A.L.R.Fed. 431 (2nd Cir.1978); *Kauz v. United States*, 188 F.2d 9 (5th Cir.1951); *Homan v. United States*, 279 F.2d 767 (8th Cir.1960); *George v. State*, 27 Ala.App. 196, 169 So. 325 (1936); *Whaley v. State*, 157 Fla. 593, 26 So.2d 656 (1946); *Kirby v. State*, 25 Okl.Cr. 330, 220 P. 74, 33 A.L.R. 1212 (1923); *State v. Allen*, 276 Or. 527, 555 P.2d 443 (1976); *see also* McCormick on Evidence 104–05 (2d ed. 1972); 98 C.J.S. *Witnesses* § 643 (1957). Rule 608 of the Federal Rules of Evidence does not explicitly cover this point.[5] In Weinstein & Berger, Evidence ¶ 608[08] (1982), they note this point and utilize traditional evidentiary sources:

"The same approach should be used in deciding whether to admit rehabilitating evidence after the witness has been contradicted by the testimony of other witnesses. Wigmore points out that 'the insinuation against Moral Character is here more remote' than in the case of prior inconsistent statements and McCormick states that most courts do not view contradiction as an attack on character. Nevertheless, the mandate in Rule 401 to admit all relevant evidence should be construed to authorize—but not to require—

4. The State's response at the bench conference on this issue was:

"There were never preliminary hearings held on those warrants for either Michelle Greaser or for Pamela Burner, both of which were indicted at the November term of the 1981 grand jury, and both of which indictments were not for the sale, but for aiding and abetting in the sale, which is not the sale itself; and the indictments are specific as to that fact. And on that basis, the State does not believe that the warrants, which are not the actual charges which are brought against the people, should be admitted into evidence."

5. Rule 608 provides:

"(a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

"The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility."

the admission of supportive character evidence if the trial judge finds in the circumstances of the particular case that the contradiction amounted to an attack on veracity." (Footnotes omitted)

We believe the issue, while committed to the sound discretion of the trial judge, is to be evaluated in light of the totality of the circumstances of the given case. Obviously, there are frequent occasions during a trial when testimony of individual witnesses will be at variance. This should not automatically give rise to a right to introduce character evidence as to truth and veracity. The fact that the defendant denies committing the crime does not alone bring on a right to have character witnesses to testify as to his truth and veracity. A different result may be warranted where the State on cross-examination relentlessly pursues the defendant with questions designed to force him to continually acknowledge that his testimony was in conflict with that of the State's witnesses.[6]

In the context of the present case, we do not believe that the trial court abused its discretion. On direct examination, the defendant was asked whether he had sold LSD to the undercover informant. The defendant's answer was not a direct denial but a statement to the effect that he had never seen LSD until after he was arrested. On cross-examination, he was asked if the undercover informant had lied when he had testified that he had bought the LSD from the defendant. The defendant responded that the informant had lied. The matter was not pursued further by the prosecuting attorney.

The final evidentiary claim is that the trial court admitted inadmissible hearsay evidence. The assignment arises out of the State's examination of Patrolman Theodore A. Offutt. Patrolman Offutt testified about the events leading up to the defendant's arrest. He stated that he and the undercover informant were planning the transaction that was to take place between the informant and the defendant. In the officer's presence, the informant telephoned the defendant to arrange for the meeting. The exact testimony was as follows:

"Q Now, Mr. Offutt, following the taking down of the serial numbers of the money, what did you next do?

"A There was a phone call made by Mr. Burroughs [the informant] to Mr. Zaccagnini at the office. I ...."

Defense counsel then objected; the objection was overruled; and the examination proceeded to an entirely different matter. In Syllabus Point 9 of *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982), we stated:

"We have generally defined hearsay as where a witness testifies in court with regard to out-of-court statements of another for the purpose of proving the truth of the matter asserted."

Patrolman Offutt did not testify about the statements of the informant or the defendant. He merely indicated that the informant had called the defendant. We do not believe that this constituted hearsay.

## IV.

The jury convicted the defendant on all three counts in the indictment, and he was sentenced to three consecutive terms in the state penitentiary for these three crimes: (1) delivery of LSD; (2) possession of LSD

---

**6.** We have dealt with a related aspect which is the practice of requiring the defendant or any witness on cross-examination to state that contradicting witnesses have testified falsely. Independently of any right to utilize good character witnesses, we have indicated that excessive use of this technique can lead to reversible error in *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), where we said in Syllabus Point 3:

"It is not improper on cross-examination to direct a witness to specific previous testimony of another witness and ask the witness whether he agrees or disagrees with such testimony. It is objectionable on cross-examination to require a witness to state whether another witness' testimony is true or false, since this is the ultimate question that a jury must decide. However, the failure to sustain an objection to such improper question will not necessarily result in error, unless the technique has been used so pervasively and abusively in the cross-examination as to substantially distort the witness' testimony on critical trial issues."

with intent to deliver; and (3) possession of cocaine with intent to deliver. On appeal, he claims that the two counts relating to possession with intent to deliver were one transaction under Syllabus Point 3 of *State v. Barnett,* 168 W.Va. 361, 284 S.E.2d 622 (1982): "Delivery of two controlled substances at the same time and place to the same person is one offense under our double jeopardy clause. W.Va. Const., art. III, § 5." Consequently, the defendant maintains that there were only two offenses and not three.

*Barnett* is factually distinguishable from the present case. In *Barnett,* the defendant was convicted of delivery of phencyclidine and secobarbital. Neither of these substances was a narcotic, and the penalty for the delivery of each was the same under W.Va.Code, 60A–4–401(a)(ii), which is imprisonment of not less than one nor more than five years or a fine of not more than $15,000, or both. Thus, in *Barnett,* we were dealing with the simultaneous delivery of two controlled substances that violated the same statutory provision and carried the same penalty.

When the entire framework of our Uniform Controlled Substances Act is reviewed, several things are apparent. First, it is modeled after the Uniform Controlled Substances Act promulgated by the National Conference of Commissioners on Uniform State Laws and is similar to portions of the Federal Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 801, *et seq.* Our statute, the Uniform Act, and the Federal Act all contain five schedules which list various controlled substances. Each schedule starting with Schedule I and ending with Schedule V lists drugs in a descending order of dangerousness. This is demonstrated by the initial criteria for a drug's placement on a given schedule as shown by W.Va.Code, 60A–2–203 (Schedule I), 205 (Schedule II), 207 (Schedule III), 209 (Schedule IV), and 211 (Schedule V).[7] Not only does our Act rate the various drugs by their dangerousness but it provides for different levels of punishments depending on the seriousness of the drug under W.Va.Code, 60A–4–401(a).[8]

7. The texts of W.Va.Code, 60A–2–203, 205, 207, 209 & 211 state:

§ 203: "The state board of pharmacy shall recommend to the legislature that a substance be included in Schedule I if it finds that the substance:

"(1) Has high potential for abuse; and

"(2) Has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision."

§ 205: "The state board of pharmacy shall recommend to the legislature that a substance be placed in Schedule II if it finds that:

"(1) The substance has high potential for abuse;

"(2) The substance has currently accepted medical use in treatment in the United States or currently accepted medical use with severe restrictions;

"(3) Abuse of the substance may lead to severe psychic or physical dependence."

§ 207: "The state board of pharmacy shall recommend to the legislature that a substance be placed in Schedule III if it finds that:

"(1) The substance has a potential for abuse less than the substances listed in Schedules I and II;

"(2) The substance has currently accepted medical use in treatment in the United States; and

"(3) Abuse of the substance may lead to moderate or low physical dependence or high psychological dependence."

§ 209: "The state board of pharmacy shall recommend to the legislature that a substance be placed in Schedule IV if it finds that:

"(1) The substance has a low potential for abuse relative to substances in Schedule III;

"(2) The substance has currently accepted medical use in treatment in the United States; and

"(3) Abuse of the substance may lead to limited physical dependence or psychological dependence relative to the substances in Schedule III."

§ 211: "The state board of pharmacy shall recommend to the legislature that a substance be placed in Schedule V if it finds that:

"(1) The substance has a low potential for abuse relative to the controlled substances listed in Schedule IV;

"(2) The substance has currently accepted medical use in treatment in the United States; and

"(3) The substance has limited physical dependence or psychological dependence liability relative to the controlled substances listed in Schedule IV."

These are the same criteria used in the Federal Act, 21 U.S.C. § 812, and the Uniform Act.

8. W.Va.Code, 60A–4–401(a), states:

"Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

Furthermore, because of the definition of "narcotics" under W.Va.Code, 60A–1–101(p),[9] this type of drug dealing receives the highest penalty under W.Va.Code, 60A–4–401(a)(i). A similar pattern can be found in the Federal Act, 21 U.S.C. § 801, *et seq.,* and the Uniform Act.

It is clear from our Act that the legislature did not intend that all drug transactions should be treated alike. In the present case, the defendant's cocaine conviction involved a "narcotic drug" since cocaine is a derivative of coca leaves, W.Va. Code, 60A–2–206(b)(4), and by virtue of W.Va.Code, 60A–1–101(p), it is included within the definition of "narcotic drug." This offense carries the maximum penalty under W.Va.Code, 60A–4–401(a)(i), which is one to fifteen years or a fine of twenty-five thousand dollars, or both.

The defendant's conviction of possession with intent to deliver LSD involves a Schedule I drug. W.Va.Code, 60A–2–204(d)(12). Since LSD is not within the definition of a "narcotic drug," the punishment is prescribed by W.Va.Code, 60A–4–401(a)(ii), which is imprisonment for one to five years or a fine of fifteen thousand dollars, or both. Thus, we are confronted with two convictions for possession with intent to deliver involving two separate drugs whose punishments carry two separate penalties.

It must be kept in mind that possession with intent to deliver is largely a factual question and conviction may be sustained under a variety of different facts. *State v. Drake,* 170 W.Va. 169, 291 S.E.2d 484 (1982). Furthermore, possession with intent to deliver because of its graduated penalties differs from simple possession, which under W.Va.Code, 60A–4–401(c), is a misdemeanor regardless of the type of drug possessed.

We acknowledge that it is difficult to produce any harmony from the cases that have dealt with the question of whether the possession of different drugs constitutes one or several offenses. As a general proposition, those jurisdictions that find separate offenses for multiple possessions of drugs do so based on some analysis of their Uniform Controlled Substances Act, particularly analysis of the fact that different punishments are imposed for different categories of drugs. *E.g., United States v. Pope,* 561 F.2d 663 (6th Cir.1977); *People v. Schroeder,* 264 Cal.App.2d 217, 70 Cal. Rptr. 491 (1968); *State v. Adams,* 364 A.2d 1237 (Del.Super.1976); *Parker v. State,* 237 So.2d 253 (Fla.App.1970); *State v. Williams,* 542 S.W.2d 3 (Mo.App.1976); *State v. Meadors,* 177 Mont. 100, 580 P.2d

---

"Any person who violates this subsection with respect to:

"(i) A controlled substance classified in Schedule I or II which is a narcotic drug, is guilty of a felony and upon conviction may be imprisoned in the penitentiary for not less than one year nor more than fifteen years, or fined not more than twenty-five thousand dollars, or both;

"(ii) Any other controlled substance classified in Schedule I, II, or III, is guilty of a felony and upon conviction may be imprisoned in the penitentiary for not less than one year nor more than five years, or fined not more than fifteen thousand dollars, or both;

"(iii) A substance classified in Schedule IV, is guilty of a felony and upon conviction may be imprisoned in the penitentiary for not less than one year nor more than three years, or fined not more than ten thousand dollars, or both;

"(iv) A substance classified in Schedule V, is guilty of a misdemeanor and upon conviction may be confined in the county jail for not less than six months nor more than one year, or fined not more than five thousand dollars, or both."

**9.** W.Va.Code, 60A–1–101(p), provides:

" 'Narcotic drug' means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

"(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate.

"(2) Any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (1) of this subdivision, but not including the isoquinoline alkaloids of opium.

"(3) Opium poppy and poppy straw.

"(4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine."

903 (1978); *White v. State*, 568 P.2d 329 (Okl.Cr.1977); *State v. Collier*, 567 S.W.2d 165 (Tenn.1978); *Ellis v. State*, 544 S.W.2d 908 (Tex.Cr.App.1976); *Melby v. State*, 70 Wis.2d 368, 234 N.W.2d 634 (1975). Those jurisdictions that find only one offense usually do not focus on the statutory punishment scheme but adopt a rule of lenity. *E.g., Braden v. United States*, 270 F. 441 (8th Cir.1920); *United States v. Martin*, 302 F.Supp. 498 (W.D.Pa.1969), *aff'd*, 428 F.2d 1140 (3d Cir.1970), *cert. denied*, 400 U.S. 960, 91 S.Ct. 361, 27 L.Ed.2d 269; *Pitts v. State*, 256 Ark. 693, 509 S.W.2d 809 (1974); *People v. Manning*, 71 Ill.2d 132, 15 Ill.Dec. 765, 374 N.E.2d 200 (1978); *State v. Butler*, 112 N.J.Super. 305, 271 A.2d 17 (1970).

Certainly, we do not quarrel with cases like *United States v. Williams*, 480 F.2d 1204 (6th Cir.1973), where the court held that four packets of heroin found on the defendant's premises would not support four separate charges for possession of heroin.

We, however, do not find persuasive, as have some courts, *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), where the United States Supreme Court found that the transportation of two women in interstate commerce in the same car for purposes of prostitution was one offense pursuant to the statutory construction rule of lenity. In the present case, our statute does provide different penalties for different categories of drugs.

Both *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), dealt with double jeopardy aspects of federal drug violations. In each case, the question was whether a single sale of a narcotic which was punishable under several different statutes violated jeopardy principles. The Supreme Court held it did not. *Blockburger's* statement is commonly used for determining what is the same offense:

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309.[10]

Of more applicability is *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), where the defendant claimed that his single act of conspiring to import marijuana into this country for purposes of distribution should not result in two separate convictions—one for conspiring to import under 21 U.S.C. § 963, and the other for conspiring to distribute under § 846. The United States Supreme Court, after analyzing the two sections, stated: "Here, we confront separate offenses with separate penalty provisions that are contained in distinct Subchapters of the Act. The provisions are unambiguous on their face and each authorizes punishment for a violation of its terms." 450 U.S. at 336, 101 S.Ct. at 1141, 67 L.Ed.2d at 280. The Court then proceeded to apply the *Blockburger* test and stated:

"Sections 846 and 963 specify different ends as the proscribed object of the conspiracy—distribution as opposed to importation—and it is beyond peradventure that 'each provision requires proof of a fact [that] the other does not.' Thus, application of the *Blockburger* rule to determine whether Congress has provided that these two statutory offenses be punished cumulatively results in the unequivocal determination that §§ 846 and 963 ... proscribe separate statutory offenses the violations of which can result in the imposition of consecutive sentences." 450 U.S. at 339, 101 S.Ct. at 1142, 67 L.Ed. at 281–82.

It does appear from *Albernaz v. United States, supra*, that the United States Supreme Court in viewing penal statutes to determine if they impose multiple punishments for the same offense utilizes the

---

**10.** *Blockburger* relied on an earlier case, *Gavieres v. United States*, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911).

*Blockburger* test as a rule of statutory construction: "The *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." 450 U.S. at 340, 101 S.Ct. at 1143, 67 L.Ed.2d at 282. *See also Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Once the determination is made that statutory offenses are separate under the *Blockburger* test by virtue of the fact that each provision requires proof of an additional fact which the other does not, then multiple punishments are appropriate.

We utilized much this same approach in *State v. Pancake,* 170 W.Va. 690, 296 S.E.2d 37, 42 (1982), to determine whether the defendant could be punished separately for first degree sexual assault and burglary:

"Using *Blockburger's* same evidence test to see if we have a greater and lesser offense, we find that proving each crime committed by Pancake requires proof of facts that the other does not, e.g., breaking and entering a dwelling is an element to be proved for a burglary conviction; and forcible sexual violation of a person must be proved for rape. Rape is not a lesser-included offense of burglary; nor vice versa." (Footnote omitted)

■ Confining ourselves to the facts of this case and utilizing the *Blockburger* same offense test, we conclude that possession with intent to deliver a narcotic drug is a separate and distinct offense from that of possession with intent to deliver another prohibited controlled substance. This is because there is embodied within the penalty provision, W.Va.Code, 60A–4–401(a)(i), a separate definitional provision: "a controlled substance ... which is a narcotic drug." This is a different and distinct element of proof and, as previously noted, this offense carries a different penalty than the other controlled substance penalties. Clearly, in order to convict for this crime as distinguished from other controlled substance violations, it is necessary to prove that it is a narcotic substance under W.Va.

Code, 60A–1–101(p). We therefore conclude that double jeopardy principles are not violated.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Marion County.

Affirmed.